# IN THE COURT OF APPEALS OF IOWA

No. 21-0477
Filed March 2, 2022

IN RE THE MARRIAGE OF JULIE ANN DAVIS
AND ROBERT ARTHUR DAVIS

Upon the Petition of
**JULIE ANN DAVIS,**
        Petitioner-Appellant,

And Concerning
**ROBERT ARTHUR DAVIS,**
        Respondent-Appellee.

_____

        Appeal from the Iowa District Court for Woodbury County, Duane E.

Hoffmeyer, Judge.


        A former wife challenges the economic provisions of a divorce decree.

**AFFIRMED AS MODIFIED.**


        Stanley E. Munger of Munger, Reinschmidt & Denne, LLP, Sioux City, for

appellant.

        Andrew B. Howie of Shindler, Anderson, Goplerud & Weese, P.C., West

Des Moines, for appellee.


        Heard by Tabor, P.J., and Greer and Ahlers, JJ.

**TABOR, Presiding Judge.**

After fifty-six years of marriage, Julie and Rob Davis divorced. In dividing their assets, the district court decided four tracts of farmland were gifts to Rob from his parents and excluded those properties from the marital estate. Julie appeals that decision, as well as contesting the amount of spousal support and the denial of trial attorney fees. She also asks for appellate attorney fees.

Because we agree with the district court's analysis of the "gifting plan" carried out by Rob's parents, we affirm the property division. But in recognition of the extraordinary length of the marriage, Rob's outsized net worth leaving the marriage, and Julie's vast contributions during the marriage, we approve Julie's request for higher spousal support. We order Rob to pay Julie $4000 per month for the next fifteen years. After that hike in spousal support, we find Julie can afford to pay her own trial and appellate attorney fees.

## I. Facts and Prior Proceedings

Julie and Rob wed in 1964, while they were still in high school. Julie was pregnant with their first son and, given the norms of the time, she could not continue in sports or graduate with her class. Rob went on to college. Julie stayed home. Rob hit the books. Julie supported the family.

After graduating from Iowa State University with a degree in animal science, Rob worked as a hog buyer in Davenport. Then in 1972, Rob moved his family back to northwest Iowa, where he started farming with his father, Robert L. Davis (Davy). Rob, Julie, and their sons lived in a farmhouse near Moville belonging to Davy and Darlene (Dar), Rob's mother. Rob and Davy entered an oral partnership agreement to feed cattle and hogs on land owned by Davy. In 1980, the Davis

Livestock Company signed a partnership agreement including Rob's brother Craig, who ran a feed store.[1]  Together, the three carried on a successful enterprise, buying and leasing farmland, selling products, and turning a nice profit.  But as time wore on, Davy desired a less hands-on role.  To that end, he and Dar gradually ceded their ownership stakes to their sons.[2]

Meanwhile, Julie did nearly all the child rearing and housework during the marriage.  For almost three decades, she balanced a nine-to-five job with her home life on the farm.  She would often wake at the crack of dawn to prepare breakfast for Rob and the children, put in a full day at the office, and then rush home to cook supper.  Julie also managed the household finances, was involved in the community, and did bookkeeping for the livestock partnership.

During their marriage, Julie and Rob pooled their incomes in a joint account, which they used for everyday expenses and larger purchases.  They maintained that arrangement until both retired.  Julie retired from her administrative position at a doctor's office in 2009.  Rob soon followed suit, retiring from farming in 2010.  In retirement, they spent winters in Arizona.

But soon after retiring, Rob learned he had multiple myeloma.  Julie testified that she attended to Rob's needs during his oncology treatments and rehabilitation.  After Rob's cancer went into remission, he tried returning to farming but the

---

[1] The 1980 agreement assigned half the shares to Davy and one-quarter each to Rob and Craig.  In 1991, Davy, Rob, and Craig signed a new partnership agreement, this time assigning 45 percent of shares to Davy and 27.5 percent to each son.  The 1991 agreement is still in force today.

[2] Besides Rob and Craig, Davy and Dar had two daughters: Cathy and Connie.  Dar testified that when she and Davy gave ownership to their sons, they would give an equivalent amount of cash to their daughters.

disease and treatment had taken its toll on his body. A few years later, Davy died, triggering a restructuring of the family partnership.[3] And then in the summer of 2019, Rob "kicked" Julie out of their house, according to her testimony. She responded by filing for divorce.

At issue in the divorce proceedings were farm assets worth nearly six million dollars. Rob and Julie agreed on the assessed value. But they disagreed whether four properties should factor into the distribution. Those properties were (1) the 157.5-acre Jahn farm; (2) the 108.5-acre Graham farm; (3) the 184.5-acre Sparr farm; and (4) the "home 80," which included the house where Rob and Julie lived for more than forty years.

A brief history of the first three properties helps frame the debate. Rob's parents bought the Jahn farm in 1964. In 1987, they transferred ownership of that property to the partnership. The partnership bought the Graham farm on contract in 1987 and the Sparr farm in 1991. After Davy's death, the partnership deeded the three farms to Rob. Soon after, Rob moved the properties to a revocable trust he created with Julie to fulfill their own estate plan.[4] At trial, Rob maintained that his parents gave him these three properties through the partnership. In contrast, Julie argued the farms were compensation for Rob's work in the partnership and thus marital property. In the end, the district court agreed with Rob and awarded

---

[3] After Davy's death, Rob and Julie bought another 6.75 percent interest in the partnership. On top of that percentage, as part of their estate planning, Rob's parents assigned him shares totaling another 9 percent between 2004 and 2017. Those additions meant Rob owned 43.25 percent (27.5 + 6.75 + 9) interest in the partnership.

[4] Julie testified: "[W]e established a trust in order to be able to pass the land that we had acquired to our kids without them having to pay inheritance tax."

him the three farms as gifted property outside the marital estate. The parties also disagreed on the 80-acre home place. Rob's parents bought this Grundy Avenue property in 1952. There, Davy and Dar raised their four children. Then in 1978, when Davy and Dar built a new house, Julie and Rob moved into the Grundy Avenue house, likewise raising their children there. According to Rob, at the direction of their attorneys, Davy and Dar incrementally transferred their interests in "home 80" to their sons.[5] Rob continues to live at "home 80," and his grandson has joined him there. Like the three other farms, Rob argued "home 80" was gifted property from his parents. The district court agreed, declining to include those acres in the divisible assets.

When all was said and done, Rob took away about $4.6 million in assets. And, following an equalization payment of $240,000, Julie received marital assets just shy of $1.4 million.

Beyond the property dispute, Julie sought spousal support, citing their long marriage, advanced ages, health issues, fixed incomes, and the asset distribution. The district court agreed support was appropriate and awarded her $1285 per month for 120 months.[6]

And, finally, Julie requested attorney fees. Despite her hefty bill— exceeding $100,000—the court had both parties pay their own way.

---

[5] During the same stretch, the parents transferred their interests in a property called the Simmons farm, where Craig lived, to both sons. Eventually, Rob and Craig did an exchange under section 1031 of the Internal Revenue Code so that each would own his farm outright without paying capital gains tax on a sale.

[6] Julie asked the district court for $15,539 per year ($1294 per month) in spousal support. But that number assumed a fifty-fifty asset division.

On appeal, Julie challenges the asset distribution, seeks $5000 more per month in spousal support, and requests attorney fees—both trial and appellate.

## II. Scopes and Standards of Review

We review dissolution cases de novo. Iowa R. App. P. 6.907; *In re Marriage of Larsen*, 912 N.W.2d 444, 448 (Iowa 2018). We give weight to the district court's fact findings, particularly on witness credibility, but they do not bind us. *See In re Marriage of Sullins*, 715 N.W.2d 242, 247 (Iowa 2006). Because each divorce case has its unique facts, "[p]recedent is of little value." *In re Marriage of Brown*, 776 N.W.2d 644, 647 (Iowa 2009) (citation omitted).

When it comes to spousal support, any award is a matter of discretion and not a matter of right. *In re Marriage of Mann*, 943 N.W.2d 15, 20 (Iowa 2020). So we accord "considerable latitude" to the district court and will disturb its award only when it fails to do equity. *In re Marriage of Stenzel*, 908 N.W.2d 524, 531 (Iowa Ct. App. 2018).

As for attorney fees, we review their denial for abuse of discretion. *In re Marriage of Goodwin*, 606 N.W.2d 315, 324 (Iowa 2000). We exercise our own discretion in deciding whether to award appellate attorney fees. *Mann*, 943 N.W.2d at 23.

## III. Discussion

### A.     Property Distribution

### 1.     Jahn, Graham, and Sparr Farms

As the district court observed: "The fighting issue in this case is how to treat Rob's interest in Davis Livestock and the real estate distributed by Davis

Livestock." At base, Rob and Julie disagree whether the partnership interests and the farms themselves were gifts to Rob from his parents.

Whether an asset was gifted depends on the circumstances of its acquisition and the intent of the would-be donor. *In re Marriage of Liebich*, 547 N.W.2d 844, 850 (Iowa Ct. App. 1996). If an asset *was* a gift to one of the spouses, it is excluded from the equitable distribution scheme. Iowa Code § 598.21(6) (2019). But an exception to exclusion arises if refusing to divide the gifted property is inequitable to the other spouse or to the children of the marriage. *Id*.; *In re Marriage of McDermott*, 827 N.W.2d 671, 679 (Iowa 2013). Once gifted, property doesn't become marital by comingling alone. *See, e.g.*, *In re Marriage of Bohac*, No. 20-0416, 2021 WL 2126170, at *4 (Iowa Ct. App. May 26, 2021).

Julie first disputes Rob's claim that his partnership shares were gifts. She characterizes his interests as "return on investments" or compensation for Rob's work for Davis Livestock. But even if the shares were gifts, Julie contends the farms couldn't be. As she puts it, Rob makes an "erroneous and unfounded argument that since his parents gifted him an interest in Davis Livestock Company, the farm properties transmogrified into a gift for him."

Countering, Rob contends the partnership shares were gifts from his parents, the first step in their greater estate planning scheme. He explains that the second step in that scheme was the gift of the farms from the partnership to Rob as an individual.

We agree Rob acquired 36.5 percent of his 43.25 percent ownership interest in the livestock partnership by gift.[7]  We reach this conclusion after reviewing the circumstances of the partnership share transfers and the intent of Davy and Dar.  *See Liebich*, 547 N.W.2d at 850.

First, brothers Rob and Craig both received a one-quarter share of the partnership, which was bumped up to 27.5 percent each after about a decade of operation.  The record shows Davy wanted to keep decreasing his ownership interest and pass the farming enterprise along to future generations.  So he spoke with his longtime accountant and attorney and devised a plan to shift shares to his sons.  By design, the transfers were structured to avoid gift tax liability.  But hoping to speed things along, Davy first gave half his ownership interest to Dar—effectively doubling the rate of gifting.

Despite Davy's documented plan, Julie argues the partnership shares were just another form of Rob's income.  We disagree.  Rob regularly received partnership "draws" in proportion to his ownership stake.  Yet these distributions were never discounted to offset the newly acquired shares.  What's more, Rob reported income from these draws on his tax returns.  But his parents' shares were not reported as income.[8]

Also telling, Dar—at age ninety-five— testified the transfers were meant as gifts—ones intended solely for Rob.  Plus, Dar explained that, for each ownership transfer her sons received, her daughters—who were never affiliated with the

---

[7] The remaining 6.75 percent interest was marital property, bought by Rob and Julie with about $430,500 in marital funds after Davy's death.

[8] Indeed, avoiding taxation was the whole point.

partnership—received a cash equivalent.[9]  This testimony was corroborated by the family's accountant and lawyer.

Finding Dar's testimony credible and well-supported, the district court noted: "Davy and Dar had one of the best documented gifting plan/estate planning the court has seen in quite some time."  We second that observation and agree with the district court's finding that only 15.6 percent of Rob's ownership stake in the partnership (6.75 percent of 43.25 percent) was marital property.

Moving to the farm transfers, we consider Julie's argument that the Jahn, Graham, and Sparr farms owned by the partnership could not "transmogrify" into gifts to Rob in the same proportion as his partnership stake.  She urges that because the Davis Livestock Company is governed by partnership principles, we must consult Iowa Code chapter 486A, the Iowa Uniform Partnership Act.  Under that chapter, a partnership is an entity separate from its partners.  Iowa Code § 486A.201.  Thus partnership property is not property of the partners individually.  *Id.* § 486A.203.  To that end, the partners' only property interest is their ownership stake.  *Id.* §§ 486A.502, .503.  From those principles, she argues Rob's parents could not have gifted him the farms because "you cannot give away what you do not own."

Rob contends the Iowa Uniform Partnership Act does not preclude the district court's finding that the farms were gifts to him.  We agree.  The record shows in spades that it was the intent of Davy and Dar that their farmland be gifted

---

[9] Rob's sister Cathy also testified.  She corroborated Dar's story, agreeing that the cash payments corresponded with her brothers' gifted interests.  Plus, Cathy and her husband always understood that the gifts from Davy and Dar were only meant for their children—not the spouses.

to their sons. They chose to do so by creating a partnership. The partnership could transfer property held in its name. *See id.* § 486A.302. Those transfers were gifts.[10] After Davy's death, Rob received farmland from the partnership without tendering payment. On this record, we agree with the district court that the Jahn, Sparr, and Graham farms were gifted property outside the marital estate.[11]

### 2. Home 80

As for the acreage that the Davises call "home 80," we reach the same conclusion. It was gifted. In 1978, Davy and Dar moved out and Rob's family moved into the farmhouse on that property. Around the same time, Davy and Dar bought the Simmons farm where Craig's family would live. Through the years, Davy and Dar gave their sons full ownership in both properties. But instead of continuing as co-owners of each other's homes, the brothers did a 1031 exchange, trading their half interests. Because "home 80" was a gift to Rob—half outright, half indirectly—it remains his separate property. *See Bohac*, 2021 WL 2126170, at *4 (treating property whose "source" was inherited as separate).

### 3. Exception for Inequity

But our analysis doesn't end there. True, we start with the premise that gifts are excluded from division. *See In re Marriage of Oler*, 451 N.W.2d 9, 10–11 (Iowa

---

[10] These transfers were made by quitclaim deed, each for $1 consideration. Julie argues this language proves the land was purchased, not gifted. But considering all the evidence that the transfers were gifts, we reject her argument. *See Liebich*, 547 N.W.2d at 850.

[11] Like the district court, we do not believe that transfer of the farms into a revocable trust changed their gifted nature. *See In re Marriage of Dean*, 642 N.W.2d 321, 325 (Iowa Ct. App. 2002).

Ct. App. 1989). "[B]ut the premise yields where its application would be unjust."

*In re Marriage of Thomas*, 319 N.W.2d 209, 210 (Iowa 1982).

To check for inequity, we ask five questions:

(1) Did Julie contribute to the care, preservation or improvement of the property?

(2) Did she have an independent close relationship with Davy and Dar?

(3) Did Julie's contributions to the economic welfare of the marriage help preserve the gifted property?

(4) Does either Julie or Rob have special needs?

(5) Does any other matter render it unfair to Julie to have the property set aside for Rob's exclusive enjoyment?

*See McDermott*, 827 N.W.2d at 679. Other considerations, like the length of the marriage, "may indirectly bear on the question for their effect on the listed factors." *Thomas*, 319 N.W.2d at 211.

The issue is a close call. On the first question, Julie was not formally involved in the partnership. But she did at times lend a hand with the livestock, helping move cattle or round them up when they left their enclosure. That said, her biggest contribution to the preservation of the property was keeping the partnership books—a job she took over from Dar near the partnership's founding. On appeal, Rob downplays this task, characterizing it as "a few hours each month" that "contributed little." But his characterization is hard to square with the fact that, even after they separated, Rob expected Julie to continue bookkeeping.[12]

---

[12] After ousting Julie from their home, Rob cut off her access to the partnership accounts. But come month's end, Rob called, upset that "nothing was done." So, despite their separation, Julie—who had not yet found stable housing—made

This factor weighs on the side of division.

On the second question, the evidence was contested. For her part, Julie recalled a positive connection with her in-laws:

> I believe our relationship was very good over the years. We often got together for family meals, usually once a week. We would see each other at the golf course. I would play golf with Darlene sometimes. . . . [A]s they got older, whenever I made soup or meatloaf or anything like that, I always make extra and take it to them so Dar didn't have to cook quite so much and, in general, I took Dar to doctors' appointments.

Dar and Cathy painted a less rosy picture. Dar testified her relationship with Julie "became strained" over the years. Cathy testified that Julie grew to "hate" her and was "jealous" of Rob's family relationships because the siblings and parents were "all so close." On the whole, the evidence does not support an independent close relationship between Julie and Rob's parents.

On the third question, Julie did contribute to the economic welfare of the marriage through both homemaking and decades of work outside the home. We consider that Julie's salary allowed the couple to take lower draws from Davis Livestock and to loan money back to the partnership. *See* In re Marriage of Kitzman, No. 11–0441, 2012 WL 1439127, at *8 (Iowa Ct. App. Apr. 25, 2012) (describing wife's contribution to faming business through her paychecks from work outside the home). Her extensive contributions "mitigate toward division of the farm interest." *See Thomas*, 319 N.W.2d at 212.

On the fourth question, because Rob and Julie are in their mid-seventies, both have health issues. Julie testified that she has heart disease and doctors

---

arrangements to pick up the necessary financial documents. And, as of the divorce trial, she was still keeping the books.

have put in a stent. But she also testified she is still able to play pickle ball and golf. As mentioned, Rob is a cancer survivor. He testified the cancer is in remission but the nerve damage has taken a toll on his body. His physical therapist told him: "it will be a matter of time before I can't walk anymore." Comparatively, Rob appears to have greater health concerns. So this factor tips against division.

Finally, though not an independent factor, the length of this marriage bears on the unfairness of setting aside the gifted property for Rob's exclusive enjoyment. For over fifty years, Rob and Julie both contributed in different ways, but in equal measure, to building their combined wealth. But now, Rob walks away with a net worth of $4,608.605.50, nearly triple Julie's $1,377,136.50. Yet, if not for the comparison, we would see Julie as well positioned for her retirement years.

We also note that both Julie and Rob envision the same future for the land: an inheritance for their grandchildren. Rob testified that his current estate plan would gift the real estate to his surviving son and the grandchildren. Julie testified that she wanted to have the same opportunity as Rob to be remembered by her grandchildren for giving them farmland. Not to degrade Julie's desire to leave a legacy, but the more critical consideration is that even if the farmland remains with Rob, it will ultimately be inherited by their children. It is harder for Julie to argue that not dividing the gifted farmland leads to an injustice when her eventual goal for those assets will be satisfied. On balance, we agree with the district court that "we should give way to the thrust of the statute and not to its exception." *Id.*

### B. Spousal Support

Julie next contends that "a significant alimony award" is appropriate if we do not disturb the property settlement. Indeed, when assessing the equity of the

decree, "we consider the property division and spousal support provisions together in determining their sufficiency." *In re Marriage of Hazen*, 778 N.W.2d 55, 59 (Iowa Ct. App. 2009). If the asset distribution does not equalize the economic disadvantages suffered by the spouse seeking support, an award is justified. *Id.* Here, we choose to address the disparity between the parties' net worths in the award of spousal support. *See Thomas*, 319 N.W.2d at 212 (considering ownership of property acquired by gift in determining alimony).

In deciding whether to award spousal support and how much for how long, we turn to the legislature's "laundry list" of relevant factors:

> a. The length of the marriage.
> b. The age and physical and emotional health of the parties.
> c. The distribution of property made pursuant to section 598.21.
> d. The educational level of each party at the time of marriage and at the time the action is commenced.
> e. The earning capacity of the party seeking maintenance, including educational background, training, employment skills, work experience, length of absence from the job market, responsibilities for children under either an award of custody or physical care, and the time and expense necessary to acquire sufficient education or training to enable the party to find appropriate employment.
> f. The feasibility of the party seeking maintenance becoming self-supporting at a standard of living reasonably comparable to that enjoyed during the marriage, and the length of time necessary to achieve this goal.
> g. The tax consequences to each party.
> . . . .
> j. Other factors the court may determine to be relevant in an individual case.

Iowa Code § 598.21A(1).

In applying these factors, our case law slots spousal support into three categories: traditional, rehabilitative, and reimbursement. *In re Marriage of Witherly*, 867 N.W.2d 856, 859 (Iowa Ct. App. 2015). But the types can blend one

into the other. *Id.* Courts most often award traditional spousal support after long-term marriages where the divorcing couple has a set "life pattern" with predictable earning potential for both spouses. *In re Marriage of Gust*, 858 N.W.2d 402, 410 (Iowa 2015). The common durational threshold for traditional spousal support is two decades of marriage. *Id.* The Davises crossed that threshold more than thirty years ago. And we no longer are looking at earning potential but set retirement income for both Rob and Julie. Traditional spousal support is appropriate given the remarkable length of this marriage, the advanced age of the former spouses, and the disparity in their net worths and income-generating assets.

We also see a case for reimbursement alimony. That kind of award is "predicated upon economic sacrifices made by one spouse during the marriage that directly enhance the future earning capacity of the other." *In re Marriage of Francis*, 442 N.W.2d 59, 64 (Iowa 1989). Reimbursement alimony is similar to a property award, but rather than dividing tangible assets, it recognizes the personal nature of the recipient's sacrifice that allowed the obligor to pursue a more lucrative career. *Id.* As Julie relates, she set aside her own academic ambitions to support the family while Rob pursued his animal science degree. No doubt that education contributed to Rob's eventual success running a livestock partnership. And now that career has provided Rob with revenue-producing assets not available to Julie. On these facts, Julie's lost educational opportunities and lower retirement income support an award of reimbursement alimony. *See In re Marriage of Singer*, No. 02-1770, 2003 WL 22807034, at *3 (Iowa Ct. App. Nov. 26, 2003).

Call it traditional or call it reimbursement, either way, Julie is entitled to a greater spousal support award. The amount and length of the award depends on

Julie's need and Rob's ability to pay.[13] *See In re Marriage of Wendell*, 581 N.W.2d 197, 201 (Iowa Ct. App. 1998). Our "yardstick" is Julie's potential to secure a standard of living reasonably comparable to the one she enjoyed during their long marriage. *See Gust*, 858 N.W.2d at 411. "[F]or older couples who have grown their wealth together and commingled their assets and incomes, they are likely to have a more definite and measurable standard of living for which a court can determine whether a spousal support award would be appropriate."[14]

Julie and Rob lived a "pretty frugal" lifestyle as they raised their sons. But in later years, they enjoyed the fruits of their labor. Case in point, they escaped the northwest Iowa winters for warmer climes. For example, in 2006 they bought a vacation home in Arkansas to be closer to their son and his family. They also bought a condo in Arizona to spend the winter months. Back in Iowa, they owned small lots at a nearby golf course.

Julie expected that after the divorce, Rob would spend summers in Iowa and winters at their Arizona vacation home. She testified: "I think I should be allowed to at least rent a home and have the same lifestyle that he does and rent a home for the three months in the wintertime."

But to afford that lifestyle, she needs support. At trial, she estimated her monthly expenses were between $7000 and $10,000. Rob contends that Julie exaggerates her post-divorce living expenses; he pegs them at no more than $6000 per month. He also notes that despite not sharing in the gifted property,

---

[13] We recognize alimony payments are no longer tax deductible and are not considered taxable income to the recipient. *See Mann*, 943 N.W.2d at 21.
[14] Stephanie L. Tang, *The Spike in Silver Splitters: Examining Special Considerations for Graying Divorces*, 28 Elder L.J. 39, 54 (2020).

"Julie still received a net property award of $1,377,136.50 in marital assets that included a cash payment from Rob for $240,087.00, plus another $225,000.00 in cash that Julie had already received when Rob exercised his option to buy out Julie's share of the parties' Arizona home." He asserts those cash payments will allow her to buy "a new comfortable residence with little or no debt." He also points out that she received about twelve percent more than he did when the court divided their securities and investments, which would provide her "comfortable living standards for the remainder of her life."[15] He claims: "Adding an onerous monthly alimony payment in addition to the cash property equalization will endanger Rob's ability to remain solvent."

But the numbers betray him. His net worth after the divorce was $4,608.605.50—nearly three times Julie's holdings. That discrepancy exists even though her contributions to their marriage matched or eclipsed his efforts over their fifty plus years together. Julie took care of the children, the cooking, the cleaning, the household chores, the family finances, and the partnership books. Despite that, she still made time to hold down a job at a doctor's office for nearly thirty years. Unlike the spouse seeking support in *Mann*, Julie was both economically employed and domestically overemployed. *See* 943 N.W.2d at 22.

---

[15] In the decree, the court stated that their investment and dividend income would be "close to equal based upon the agreed-upon division of assets." Yet the record reveals some inequality. Exhibit 139, a document created by Rob's accountant, showed that Rob's projected investment income, dividend income, and IRA distribution was $17,567 per year, while Julie's projected annual income from those sources was $13,438. Because the parties do not contest these estimates, we use those numbers in our spousal support calculation.

The district court described the parties' incomes as "almost fixed." But the record reveals a marked disparity in that fixed retirement income. Let's start with their Social Security benefits. Julie receives a net benefit of $800 per month, while Rob receives a net benefit of $2,085 per month. So the court pegged the award to the difference, $1285.60. But that attempt to equalize their incomes comes up short. It does not account for the cash rents that Rob will receive from the four farm properties. Those properties generate net rental income totaling $112,214 per year. Crunching the numbers, Rob will have an annual net income of $154,801[16] and Julie will receive only $23,038 per year.[17]

Given that difference, we believe equity demands an increase to $4000 per month for fifteen years. His obligation will terminate upon Julie's death or remarriage or the expiration of fifteen years. As with the original support order, the obligation does not terminate upon Rob's death. This increased award will not only make up the discrepancy in their Social Security benefits, but will provide Julie with a monthly retirement income more comparable to Rob's. Indeed, even under Rob's estimate of Julie's monthly expenses at around $6000, she would not make ends meet without a stipend of at least $4000.

In setting a lower support amount, the district court anticipated that Rob would have to rely on his farm income for "living expenses and cost of servicing the property settlement indebtedness." But the decree gave Rob the option of making the equalization payment in a lump sum or installments. Either way, the

---

[16] $17,567 (yearly investment income (see footnote 15)) + $25,020 (yearly Social Security benefits) + $112,214 (yearly farm rentals)

[17] $13,438 (yearly investment income (see footnote 15)) + $9600 (yearly Social Security benefits)

property settlement is not spousal support. It is the equitable division of their marital assets. Iowa Code § 598.21. By contrast, spousal support is intended to compensate a spouse who leaves the marriage at a financial disadvantage. *In re Marriage of Earsa*, 480 N.W.2d 84, 86 (Iowa Ct. App. 1991). Julie meets that description. And under the new award, both Rob and Julie should be able to maintain a standard of living reasonably comparable to that enjoyed at the end of their long marriage.

### C.      Attorney Fees

Finally, Julie asks for an order that Rob pay her attorney fees. First, she contends the district court abused its discretion in declining her request for attorney fees, asking us to award $54,769—half of what she paid for her trial representation. She follows that request with a plea for appellate attorney fees.

Both awards are discretionary. *In re Marriage of Scheppele*, 524 N.W.2d 678, 680 (Iowa Ct. App. 1994). Here, given our decision to more than triple her amount of monthly spousal support, we find that Julie can afford to pay her own attorney fees for both the trial and the appeal.

**AFFIRMED AS MODIFIED.**